UNITED STATES, Appellee,

v.

Terence N. BRADFORD, Electrician's Mate Third Class U.S. Navy, Appellant.

No. 58077.
NMCM Misc. Dkt. No. 87–1130.

U.S. Court of Military Appeals.

Nov. 30, 1987.

For Appellant: *Captain Mark Foster*, USMCR (argued); *Lieutenant Commander J.J. Quigley*, JAGC, USN.

For Appellee: *Lieutenant Howard B. Goodman*, JAGC, USNR (argued); *Captain Wendell A. Kjos*, JAGC, USN.

*Opinion of the Court*

EVERETT, Chief Judge:

In this appeal from the decision of the Court of Military Review in favor of the Government, 24 M.J. 831 (1987), *see* Art. 62(a), Uniform Code of Military Justice, 10 U.S.C. § 862(a), Bradford seeks reinstatement of the ruling of the military judge that he had been denied a speedy trial,

guaranteed under R.C.M. 707(a)(2), Manual for Courts-Martial, United States, 1984. This case was argued on October 14, 1987, and we now decline to order the relief sought. Instead, we affirm the decision below.

## I

At his general court-martial, appellant faces charges of conspiracy to commit assault, wrongful possession and use of alcoholic beverages aboard ship, breach of the peace, aggravated assault, and assault, in violation of Articles 81, 92, 116, and 128, UCMJ, 10 U.S.C. §§ 881, 892, 916, and 928, respectively. After arraignment but before presentation of the evidence, *see* R.C.M. 905(a) and (b), defense counsel moved for dismissal of all these charges. He contended that Bradford had not been tried within 120 days of the imposition of restraint under R.C.M. 304(a)(2), as required by R.C.M. 707(a)(2). *See* R.C.M. 707(e). After receiving evidence relating to the motion and hearing argument of both counsel, the military judge entered detailed findings of fact in support of his ultimate conclusion and ruling in favor of the defense. *See* R.C.M. 905(d).

The Government filed a timely appeal from this ruling, *see* Art. 62(a)(2); in due course, the Court of Military Review "reverse[d] the decision of the trial judge as entirely unsupported in fact and erroneous as a matter of law, *United States v. Burris*, 21 M.J. 140 (C.M.A.1985)." 24 M.J. at 835. We granted appellant's petition for review of the following issue:

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW EXCEEDED ITS JURISDICTION IN OVERTURNING, ON AN ARTICLE 62 APPEAL BY THE GOVERNMENT, THE FACTUAL FINDINGS OF THE MILITARY JUDGE THAT MAINTAINING APPELLANT IN CLASS "D" LIBERTY RISK STATUS ON BOARD SHIP WAS FOR THE PURPOSE OF ENSURING HIS PRESENCE AT TRIAL AND WAS FUNCTIONALLY EQUIVALENT TO PRETRIAL RESTRICTION FOR SPEEDY TRIAL PURPOSES.

## II

The following chronology of events which is reflected in a stipulation of fact by the parties accepted by the military judge during litigation of the defense motion is paraphrased below:

Sept. 4, 1986 EM3 Quinn attacked while asleep aboard the USS ˙ KENNEDY

Sept. 5 Bradford interrogated as suspect

Sept. 25 Bradford reinterrogated as suspect

Oct. 2 Naval Investigative Service closes investigation on Quinn assault—unsolved

Oct. 16 Port call in Haifa, Israel, from Oct. 16–19; Bradford has full shore liberty

MSSA Kyle and MS3 Spores assaulted in town; Bradford and others interviewed by shore patrol

Oct. 17 Command investigator interviews Bradford about Haifa assaults; military ID cards taken from Bradford and others; investigation *into* Haifa assaults pending

Oct. 19 Command investigator questions Bradford about Haifa assaults

Oct. 20 ICFN Adams interviewed and admits involvement in Quinn assault; implicates Bradford in that assault

EMFN Scott interrogated about Haifa assaults; implicates Bradford in those assaults

Oct. 25 Bradford advised he is placed in Class "D" liberty-risk status beginning October 26; ship in port in Trieste, Italy, from October 27 until November 2, but Bradford restricted to ship pursuant to Class "D" liberty-risk status

Oct. 29 Bradford reinterrogated about Quinn assault

Nov. 6–9 Ship in port in Naples, Italy; again, Bradford restricted to ship

Nov. 21 SPCM charges preferred

Nov. 23 SPCM charges preferred

Nov. 24 Bradford notified of preferral of SPCM charges; placed in pretrial restriction

After considering all the evidence and argument of counsel, the military judge entered the following specific findings relevant to the events summarized above:

Number one, the initial placement of the accused on 17 [sic] October 1986 in a liberty risk status was pursuant to applicable directives, was done by competent command authority, and was done for a proper purpose.

Number two, the maintenance of the accused in that status at the commencement of the port call in Trieste, Italy on 26 October 1986 was also pursuant to applicable directives, was subjected to appropriate review and, therefore, was proper and did not cause the government to be accountable for delay for speedy trial purposes; that is to say, the clock did not start.

Number three, on 29 October 1986, the accused became, at that time, not a suspect but the prime suspect in the investigation into the assault on Petty Officer Quinn causing certain factors to change.

Number four, from and after 29 October 1986, the date on which the accused was reinterrogated—I should say, interrogated for the third time concerning the assault on Petty Officer Quinn, that interrogation being conducted by the Naval Investigative Service, I find that his maintenance in a liberty risk status which had the same functional effect as pretrial restriction, that is, to ensure his presence aboard the ship at all times, was no longer entirely actuated by a desire to avoid international difficulties or service discrediting conduct ashore, but was, as a matter of fact, at least in some measure, actuated by a desire to ensure his presence for trial.

Number five, 29 October 1986, is therefore the date on which the accountability commences for time consumed in proceeding to trial. There are, therefore, 127 days for which an accounting must be made; that is, to say from 29 October 1986 until 5 March 1987.

\* \* · \* \* \* \*

Number seven, I specifically do not find that there was any impropriety whatsoever in the ship's administration of the liberty risk program, however, in order to find that the clock did not start until sometime later than 29 October, I would have to be able to find, by at least a preponderance of the evidence, that the sole purpose in maintaining the accused in a liberty risk status beyond that date was the purpose stated in the Sixth Fleet and JFK instructions; that is, the prevention of service discrediting conduct by sailors ashore in foreign nations. I am unable to find that this continued to be the sole reason for keeping the accused aboard the ship after 29 October, the date on which he clearly was the prime focus of the investigation.

\* \* \* \* \* \*

In summary, I am starting the clock on 29 October 1986, the date when the accused was elevated to be the prime suspect in the Quinn assault. This is the last day on which I can find beyond a—by a preponderance of the evidence that the accused was maintained on board ship exclusively to prevent service discrediting conduct ashore. This means that 127 days have elapsed. Since there has been no defense delay and the amount of time excluded is 3 days [later changed to 4], 124 days [later changed to 123] remain and, therefore, under Rule for Courts-Martial 707, the charges are hereby ordered dismissed for lack of a speedy trial.

In its opinion on the Government's appeal from this ruling, the Court of Military Review iterated Ship's instruction CV67INST 1640.2F, dated September 5, 1985, under authority of which Bradford was placed in Class "D" liberty-risk status:

The instruction provides in pertinent part that liberty in a foreign port is not a right and may be withheld

to protect the reputation of foreign relations of the United States, the

Navy, or to comply with international legal hold agreements.

Thereafter, the court summarized the essence of the military judge's findings:

The trial judge specifically found that the initial placement and maintenance of ... [Bradford] in the liberty risk program were in accordance with the regulation and properly motivated. However, the trial judge determined that such conditions of liberty imposed upon ... [Bradford] became the functional equivalent of pretrial restriction, starting the speedy trial clock under R.C.M. 707(a), when the focus of the investigation shifted to ... [Bradford] as the prime suspect on 29 October. The trial judge reasoned that on 29 October ... [Bradford]'s liberty risk status was

no longer entirely actuated by a desire to avoid international difficulties or service discrediting conduct ashore, but was, as a matter of fact, at least in some measure, actuated by a desire to ensure his presence for trial.

24 M.J. at 833.

In analyzing the military judge's rationale, the court observed that the liberty-risk program does not in theory constitute restraint for speedy-trial purposes under R.C.M. 707(a)(2), but rather it "qualifies as administrative restraint under R.C.M. 304(h) which may be imposed for 'military purposes independent of military justice.'" Nonetheless, the court acknowledged that the program "may in its execution start the speedy trial clock under R.C.M. 707(a) where the program is not implemented for the purpose for which it was intended." *Id.* at 834.

Applying these principles, the court held that, contrary to the military judge's findings, Bradford's properly imposed liberty-risk status did not convert as a matter of law to pretrial restriction on October 29 merely by virtue of his having become the prime suspect on that date in the Quinn assault and, thereby, becoming the subject of an intended court-martial. Moreover, the court concluded that there was no evidence of record that the motivation of the command in continuing that status on and after October 29 was any different from what it was when properly imposed initially. The court opined:

To identify the focus of the investigation alone as the linchpin consideration without evidence that the focus of the command also shifted to punitive pretrial restraint, is arbitrary and serves neither the interest of international relations nor the criminal justice system.

*Id.* at 834.

### III

■ Article 62—which authorizes an appeal by the United States from "an order or ruling of the military judge which terminates the proceedings with respect to a charge or specification or which excludes evidence that is substantial proof of a fact material in the proceeding"—limits in subsection (b) appellate review in such appeals "to matters of law, notwithstanding section 866(c) of this title (article 66(c))." Accordingly, appellant challenges the authority of the court below to overturn the factual finding of the military judge that his restriction, from October 29 on, was for the purpose of ensuring his presence for trial and not for the purpose of continuing to serve the function of the liberty-risk program.

As a general proposition, of course, appellant is correct—Article 62(b) leaves no room for debate. Nonetheless, in entering a finding of fact, the military judge must rely on evidence of record which fairly supports that finding; in the absence of *any* such evidence, the finding is error as a matter of law. *United States v. Burris*, 21 M.J. 140, 144 (C.M.A.1985). *Cf. United States v. Cosby*, 14 M.J. 3, 4–5 (C.M.A.1982) ("Appellant contends that there was *no evidence* presented which suggested criminal behavior on his part ... *Not being a fact-finding court*, we must examine the record of trial to determine if there is *some competent evidence in the record* from which the fact-finder could find, beyond a reasonable doubt, the existence of every element of the offense charged." (Empha-

sis added)); *United States v. Brown*, 3 M.J. 402, 403 (C.M.A.1977) (In the Court of Military Appeals—where review is limited to matters of law, not fact—the applicable test for sufficiency of the evidence "is whether there is, *in the record*, some competent evidence from which the" factfinder "could find, *beyond a reasonable doubt*, the existence of every element of the" charged offense, quoting from *United States v. Taylor*, 21 U.S.C.M.A. 220, 222, 44 C.M.R. 274, 276 (1972). (First emphasis added.))

Our examination of the record supports the conclusion of the court below that there is, indeed, no evidence in the record that the command's purpose in maintaining Bradford's liberty-risk status—which was proper when initially imposed on October 25—changed at all until such time as Bradford was formally placed in pretrial restriction on November 24. Although the military judge placed the burden on the Government to demonstrate by a preponderance of the evidence that its purpose had not changed during this period,* it may reasonably be inferred that, in the absence of even a suggestion in the evidence that the purpose of the command had changed, the original purpose continued.

Appellant has called this Court's attention to two factors which he argues support the military judge's finding that the command's purpose in continuing his restriction changed on October 29. First, he points to the "total deprivation of [his] liberty" resulting from his being unable to leave the ship on or after October 25. Of course, as Bradford acknowledges, while at sea *no one* could leave the ship, and he suffered no special restrictions on his locomotion that were not borne by all others on

the ship; and while in port, it was the very purpose of the Class "D" liberty-risk status to keep Bradford out of the foreign country to avoid further international incidents. Thus, this factor does nothing to support either the military judge's findings or appellant's argument in this Court.

Second, appellant focuses on "the fact that the procedural requirements of the" ship's "liberty-risk program were not followed in" his case. Specifically, one of the provisions of the ship's instruction requires that a "Liberty Risk Board review ... recommendations for liberty-risk classification in each new case and prior to each" entry into port. Appellant argues that "[t]he logical inference" from omission of such a review in his case, either initially or prior to subsequent port calls, is that his restriction to the ship was not pursuant to a liberty risk at all "but rather [was] to ensure his presence for his upcoming court-martial."

Our review, however, supports the conclusion of the court below that the failure to strictly follow the ship's procedures is no evidence of such a sinister purpose, under the circumstances of this case. First, we note that the military judge expressly found that the initial classification of Bradford as a liberty risk on October 25 was proper, so the failure to strictly follow the instruction's review procedure at the outset was not persuasive to the military judge that the initial classification was inappropriate. Second, although the review as prescribed by the instruction was not formally accomplished prior to each port entry, we note that the initial classification occurred immediately before the October 27 port call; and so presumably, if the initial classification was proper, as the military judge found, continuation of it prior to

---

* The Rules for Courts-Martial provide that, "[i]n the case of a motion to dismiss for ... denial of the right to speedy trial under R.C.M. 707, ... the burden of persuasion [by a preponderance of the evidence] shall be upon the prosecution" "on any factual issue the resolution of which is necessary to decide" the motion. R.C.M. 905(c)(1) and (2)(B). Normally, of course, the contest surrounding a speedy-trial motion involves justification for the delay, and this prescription for the locus of that responsibility cer-

tainly is reasonable. On the other hand, in the rare instance where the contest involves the date on which the speedy-trial clock should begin to run—that is, where it involves determining precisely when the accused was notified of the preferral of charges or was restrained under R.C.M. 304(a)(2)-(4)—it seems less logical to require the prosecution to shoulder the burden of proving a negative, that is, that the accused was neither restrained nor had been notified of the preferral of charges on the date in question.

the first entry into port is not evidence of an improper motive. As to the November 6 port call, Bradford's status was reviewed by the assistant command judge advocate just prior thereto, and his recommendation to the ship's executive officer was to continue appellant as a Class "D" liberty risk.

Accordingly, we conclude that the court below properly determined as a matter of law that the military judge erred in finding that the command's purpose for continuing to restrain Bradford on and after October 29 was to ensure his presence for trial by court-martial, rather than as a liberty risk.

## IV

■ The military judge's findings seem to imply that, once Bradford became a prime suspect and, therefore, the subject of an anticipated court-martial, his restricted status that had been created initially under R.C.M. 304(h) was transmuted as a matter of law into pretrial restraint under R.C.M. 304(a). This view was rejected by the Court of Military Review. Moreover, we know of no legal precedent supporting such a theory, and none has been cited to us. Indeed, as a practical matter, to embrace this theory would give rise to a variety of unacceptable scenarios.

For instance, as the court below observed, a commander might have to choose between jeopardizing international relations by releasing a subordinate properly subject to the liberty-risk program or running afoul of R.C.M. 707. Also, a subordinate who might be properly subject to administrative restraint such as the liberty-risk program might be a person who does not deserve and would not otherwise be the subject of pretrial restraint, *see United States v. Heard,* 3 M.J. 14 (C.M.A.1977). If, however, his restricted status was transformed to pretrial restraint as a matter of law once the decision was made to prosecute him, he might arguably be entitled to release. *Id.* At a minimum, his commander would find himself forced to bring the person to trial within 120 days from that time, whereas otherwise the speedy-trial clock would not begin to run

until notice to the accused of preferral of charges.

## V

■ The findings also reveal that the military judge was proceeding on an erroneous legal premise. He found that "maintenance [of Bradford] in a liberty-risk status ... was no longer *entirely* actuated by a desire to avoid international difficulties or service discrediting conduct ashore" and that it "was ... at least in *some measure,* actuated by a desire to ensure his presence for trial." (Emphasis added.) Moreover, the judge stated that he could not find that after October 29 prevention of service discrediting conduct ashore was "the *sole* reason for keeping the accused aboard" or that from this date he was kept "on board ship *exclusively* to prevent service discrediting conduct ashore." (Emphasis added.) Obviously, the military judge considered that, unless the only purpose for restricting Bradford to the ship was to prevent an incident ashore, the Government's accountability, for purposes of R.C.M. 707, had commenced.

We recognize that an administrative restriction under R.C.M. 304(h) must not become a subterfuge whereby a commander may avoid a successful claim that speedy trial has been denied. However, we believe the test is whether the primary purpose in imposing conditions on liberty is to restrain an accused prior to trial in order to assure his presence at trial or to avoid interference with the trial process. In applying this standard, we may inquire whether the same conditions would have been imposed, even if no trial by court-martial were in prospect. In this case, it seems clear that the military judge did not use the proper criterion for determining whether the 120–day speedy trial clock had commenced to run.

## VI

We caution that, where the evidence supports a conclusion that the primary purpose of the command in imposing or in continu-

ing conditions on an accused's liberty is related to an upcoming court-martial, R.C.M. 707 applies. Here, however, the evidence does not demonstrate that the command harbored the primary purpose to impose pretrial restraint in preparation for trial or that the purpose of the liberty-risk program no longer was operative in connection with limitations on Bradford's liberty.

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

Judges COX and SULLIVAN concur.