**UNITED STATES**

v.

**Bobby J. WILKES, 254 13 8897, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 87 3794.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 7 July 1987.

Decided 21 Sept. 1988.

Lt. Daniel W. Dooher, JAGC, USNR, Appellate Defense Counsel.

Lt. Col. L.F. Henley, Jr., USMC, Appellate Government Counsel.

Before RILEY, Senior Judge, and CASSEL and RUBENS, JJ.

RILEY, Senior Judge:

At a general court-martial, appellant entered a conditional plea of guilty to one specification of unauthorized absence, three specifications of dishonorable failure to maintain funds, and ten specifications of uttering checks with the intent to defraud, in violation of Articles 86, 134, and 123a, respectively, of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 886, 923a, 934. Appellant was sentenced to be confined for three years, to forfeit $658.00 pay per month for 36 months, to be reduced to pay grade E–1, and to be discharged from the Naval Service with a bad-conduct discharge. The convening authority approved only so much of the sentence as provided for a bad conduct discharge, confinement for four months, and reduction to pay grade E–1.

As a result of a previous unauthorized absence, the appellant, on 24 December 1986, received nonjudicial punishment which included, *inter alia*, restriction for 30 days. Appellant had served 20 days of that restriction when he left without authorization once again. On 5 February 1987, appellant surrendered to military authorities in Albany, Georgia. Appellant returned to his unit (Communications Company, H and S Battalion, Camp Kinser, Okinawa) on 8 February 1987, and on the next day he began serving the remainder of the previously imposed restriction. On the last day of that restriction (19 February 1987), appellant was interviewed by agents of the Naval Investigative Service (NIS). In that interview, he confessed to writing 33 bad checks totaling over $10,000.00. Later that day, Lieutenant UBALDE, the appellant's acting executive officer, after learning of appellant's bad check offenses and his unauthorized absence, placed him on pretrial restriction. Appellant remained in that status until 24 February 1987, when he was placed in a "liberty risk" status, restricting him to the limits of the base. He remained

in that status until his trial began 125 days later on 30 June 1987.

Before this Court, appellant argues that the liberty risk program in this instance was used as a subterfuge to avoid the strict accountability of R.C.M. 707. The Government, on the other hand, argues that the appellant was placed in the liberty risk program in order to help him with an alcohol abuse problem and to avoid alcohol-related incidents involving the appellant and foreign nationals. Accordingly, government counsel urges that the appellant's restriction was valid pursuant to Rule for Courts–Martial (R.C.M.) 304(h), and therefore did not trigger the speedy trial clock under R.C.M. 707. Both appellate government and appellate defense counsel cite to *United States v. Bradford,* 25 M.J. 181 (C.M.A.1987), in support of their positions.

In *United States v. Bradford, supra,* the appellant was involved in a number of assaults in various foreign ports and was placed in a liberty risk status, restricting him to the confines of his ship. The "liberty risk" status was necessary, according to his command, to avoid international incidents. During the ensuing investigation into the assaults, Bradford became the prime suspect and was subsequently tried and convicted for those offenses. At trial, he moved to dismiss all charges against him, arguing that he was denied a speedy trial. The heart of his argument was that his status as a liberty risk was, in substance, pretrial restriction which triggered the running of the speedy trial clock. The military judge ruled that appellant's status as an administrative liberty risk, while properly imposed at first, was transformed into pretrial restriction under R.C.M. 707(a) by virtue of the fact that he became the prime suspect in the assaults. The judge dismissed the charges against Bradford because he was not brought to trial within 120 days. The Government appealed the judge's decision under Article 62, UCMJ, 10 U.S.C. § 862, and this Court reversed the ruling. 24 M.J. 831 (N.M.C.M.R.1986). The Court of Military Appeals affirmed our decision.

In *Bradford,* the Court of Military Appeals rejected the notion that administrative restraint is transmuted as a matter of law into pretrial restraint when the subject of the restraint becomes a criminal suspect, likely to face trial by court-martial. Such a result, according to the court, would "give rise to a variety of unacceptable scenarios" which could potentially jeopardize international relations by forcing commanders to release subordinates "who might properly be the subject of administrative restraint such as the liberty risk program ... [but] who would not otherwise be the subject of pretrial restraint." 25 M.J. at 186. The court cautioned, however, that "administrative restriction under R.C.M. 304(h) must not become a subterfuge whereby a commander may avoid a successful claim that speedy trial has been denied." *Id.* In this regard, the court stated that "the test is whether the primary purpose in imposing conditions on liberty is to restrain an accused prior to trial in order to assure his presence at trial or to avoid interference with the trial process." *Id.* The court went on to point out that "in applying this standard we may inquire whether the same conditions would have been imposed, even if no trial by court-martial were in prospect." *Id.*

Inasmuch as the initial restriction placed upon the appellant by Lieutenant UBALDE constituted pretrial restriction under R.C. M. 304(a)(2) and 707(a), the question presented in this appeal is just the reverse of the one generated by the *Bradford* fact pattern. Here, we must decide whether the transformation of appellant's status from pretrial restrictee to liberty risk candidate operated to *stop* the running of the speedy trial clock. Resolution of this issue hinges upon whether appellant's restriction as a liberty risk was imposed primarily for "purposes independent of military justice." R.C.M. 304(h). *See also United States v. Bradford, supra.*

As noted earlier, appellant was placed on pretrial restriction by Lieutenant UBALDE on 19 February 1987. The military judge correctly found this restriction to be pretrial restraint as contemplated by R.C.M. 304(a)(2). On 24 February, appellant was

placed on the liberty risk program which, in essence, did nothing more than change the name of his continuing restriction. He still had to muster every four hours during non-working hours. At trial, appellant's commanding officer, Major GLENN, testified that he had interviewed the appellant upon appellant's arrival at Camp Kinser in December, 1986. In that interview, appellant told him that he had had an alcohol problem and had recently completed a voluntary rehabilitation course at the Naval Hospital on Okinawa. Major GLENN stated that the liberty risk status was imposed because appellant "had all the indications of a recovering alcoholic" and, because the command wanted to protect the appellant from any alcohol-related problems in the surrounding community.

In answering the military judge's questions, however, Major GLENN gave some revealing information about his concept of the liberty risk program *vis a vis* pretrial restriction.

Q. Major Glenn, are you aware, or were you at the time as Commanding Officer, that there's a difference between restriction imposed as a punishment for nonjudicial punishment and restriction imposed as a form of pretrial restraint?

A. Oh, yes, sir.

Q. Did you ever impose restriction in your company as a form of pretrial restraint during your time as a Company Commander?

A. That's a very touchy situation, sir, and the reason I have always used the liberty risk program because of the legal ramifications; and I can't recall ever putting someone on restriction without the result of nonjudicial punishment.

Record at 24.

Q. Are you saying, sir, that if you applied restriction as a pretrial restraint, that the restriction with regard to con-

fines, as you have described it, would be less?

A. That's a hard one for me to answer because like I said, sir, I cannot recall putting anyone on restriction prior to a resolution of any judicial proceedings. I try and stay away from awarding a restriction without the punishment being awarded at my level or the punishment being awarded at the Battalion Commander's level or as a result of court-martial. The liberty risk program is an administrative tool that I have used quite a bit.

Record at 25.

Major GLENN further testified that he had neither seen nor heard of appellant having been involved in any alcohol-related incidents either on base or in the surrounding community. Additionally, there was never any indication, oral or written, to the appellant about when his liberty risk status would terminate.[1] Instead, the liberty risk restrictions remained in effect until 30 June 1987, the date of his trial.

While we may not agree with appellant's categorization of his assignment to the liberty risk program as a subterfuge to avoid R.C.M. 707, we are not convinced that concern for the appellant's safety and the maintenance of good international relations were the *primary* motivations behind the liberty risk restrictions. That is, while there may have been a genuine concern on the part of the commanding officer about appellant's suspected alcohol problem, we find that the liberty risk status was not imposed primarily for such purposes. It was imposed primarily to ensure his presence at trial, and, as such, did not stop the speedy trial clock, which continued to run uninterrupted for 131 days. This violated the 120–day rule of R.C.M. 707.[2]

Accordingly, the military judge erred in denying appellant's motion to dismiss all charges for lack of a speedy trial. The

---

1. Indeed, none of the administrative requirements of the liberty risk program, such as notification of the right of appeal, the length of the status, and the right to periodic review, were followed in the appellant's case. While this fact is not, in and of itself, determinative on the question of whether the status was appropriate-

ly imposed, it is some evidence of the command's intent behind appellant's restrictions.

2. We need not decide whether in a proper case a change from pretrial restriction to a liberty risk status would constitute a "release from restraint" as expressed in R.C.M. 707(b)(2).

findings of guilty and the sentence are set aside. All charges and specifications are dismissed.

Judge CASSEL and Judge RUBENS concur.

CASSEL, Judge *, absent.