**UNITED STATES**

**v.**

**Captain Kenneth B. PLANTS,
United States Air Force.**

**Misc Doc 2002–03.**

U.S. Air Force Court of Criminal Appeals.

30 Sept. 2002.

Appellate Counsel for the United States: Lieutenant Colonel LeEllen Coacher, Lieutenant Colonel Lance B. Sigmon, and Major Jennifer R. Rider.

Appellate Counsel for Appellee: Colonel Beverly B. Knott, Major Terry L. McElyea, Major Maria A. Fried, and Captain Stacey J. Vetter.

Before BURD, Senior Judge, PECINOVSKY, and EDWARDS, Appellate Military Judges.

## OPINION OF THE COURT

BURD, Senior Judge:

The military judge in this case dismissed the charges and specifications because he found a denial of speedy trial under Article 10, UCMJ, 10 U.S.C. § 810. The government has brought an appeal of his decision to us under Article 62, UCMJ, 10 U.S.C. § 862.

The general court-martial of Captain Plants began on 29 July 2002 at Andersen Air Force Base (AFB), Guam. The allegations against him consisted of one specification of violating a lawful general regulation on divers occasions by using a government computer to store, process, or display sexually explicit materials, in violation of Article 92, UCMJ, 10 U.S.C. § 892, one specification each of wrongful use of amphetamines and methamphetamine, both on divers occasions, and one specification of wrongful possession of methamphetamine, in violation of Article 112a, UCMJ, 10 U.S.C. § 912a, one specification of extortion, in violation of Article 127, UCMJ, 10 U.S.C. § 927, and three specifications of conduct unbecoming an officer, in violation of Article 133, UCMJ, 10 U.S.C. § 933.

After arraignment, Captain Plants' trial defense counsel made a motion to dismiss the charges and specifications, claiming a denial of speedy trial under Art. 10, UCMJ. The military judge granted the motion and dismissed the charges and specifications. In accordance with Rule for Courts–Martial (R.C.M.) 908, the trial counsel notified the military judge of the government's intent to appeal his decision under Art. 62, UCMJ. That appeal was timely filed and is now properly before us for decision. We heard oral argument on the appeal on 13 September 2002. While we accept the military judge's essential findings of fact, we disagree with his legal conclusions.[1] We hold there was no speedy trial violation under Art. 10,

UCMJ, and set aside the dismissal of the charges and specifications.

## Jurisdiction and Scope of Review

The United States may appeal an order or "ruling of the military judge which terminates the proceedings with respect to a charge or specification" in cases in which a punitive discharge may be adjudged. Article 62(a)(1), UCMJ, 10 U.S.C. § 862(a)(1). Each of the dismissed specifications in this case carries a maximum punishment that includes a punitive discharge. *Manual for Courts–Martial, United States (MCM)*, Part IV, ¶¶ 16e(1), 37e(1)(a), 53e, 59e (2000 ed.).

Despite our fact-finding powers under Article 66(c), UCMJ, 10 U.S.C. § 866(c), in ruling on issues under Article 62, we "may act only with respect to matters of law." Article 62(b), UCMJ, 10 U.S.C. § 862(b). On matters of fact, we are bound by the military judge's factual determinations unless they are unsupported by the record or clearly erroneous. *United States v. Burris,* 21 M.J. 140, 144 (C.M.A.1985). *See, e.g., United States v. Pollard,* 27 M.J. 376 (C.M.A.1989) (affirming the Coast Guard Court of Military Review's reversal of the trial judge's ruling and remanding the case to determine if the technical violations rendered accused's urinalysis unreliable as a matter of fact). "Nonetheless, in entering a finding of fact, the military judge must rely on evidence of record which fairly supports that finding; in the absence of *any* such evidence, the finding is error as a matter of law." *United States v. Bradford,* 25 M.J. 181, 184 (C.M.A.1987) (emphasis in original). "The courts may make a *de novo* ad hoc judgment on the meaning of relevant facts when dealing with constitutional issues." 2 Francis A. Gilligan & Fredric I. Lederer, *Court–Martial Procedure* § 25–83.00 at 556 (2d ed.1999) (citing *United States v. Abell,* 23 M.J. 99, 102–03 (C.M.A.1986)). "Similarly, the appellate courts normally should have the power to reverse when the trial judge misunderstood the legal significance of a fact found by the judge when that misunderstanding causes an error as to the court's ultimate finding." *Id.*

---

1. The chronology incorporated in the military judge's findings of fact and his essential findings of fact appear in Appendix I and II at the end of this opinion.

(citing *United States v. Shakur*, 817 F.2d 189 (2d Cir.1987)).

### The Law on Speedy Trial and Analysis

Art. 10, UCMJ, states:

Any person subject to this chapter charged with an offense under this chapter shall be ordered into arrest or confinement, as circumstances may require; but when charged only with an offense normally tried by a summary court-martial, he shall not ordinarily be placed in confinement. When any person subject to this chapter is placed in arrest or confinement prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or to dismiss the charges and release him.

The question of whether an accused has received a speedy trial is a question of law that is reviewed de novo. *United States v. Doty*, 51 M.J. 464, 465 (1999). "The military judge's findings of fact are given 'substantial deference and will be reversed only for clear error.' *See United States v. Edmond*, 41 M.J. 419, 420 (1995), quoting *United States v. Taylor*, 487 U.S. 326, 337, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988)." *Doty*, 51 M.J. at 465.

■ "The test for assessing an alleged violation of Article 10 is whether the Government has acted with 'reasonable diligence' in proceeding to trial." *United States v. Birge*, 52 M.J. 209, 211 (1999) (citing *United States v. Kossman*, 38 M.J. 258, 262 (C.M.A.1993)). While our superior court has made it clear that the speedy trial requirement of Art. 10, UCMJ, is more stringent than the Sixth Amendment and R.C.M. 707, it has not defined the relationship between the rule and Art. 10, UCMJ. *Birge*, 52 M.J. at 211–12.

In this case, the government complied with the requirements of R.C.M. 707. The accused was placed in pretrial confinement on 29 March 2002. Although the accused was not arraigned until 29 July 2002, which was

day 122,[2] the military judge appropriately excluded the period after 1 July because the trial counsel, in responding to a 14 June speedy trial demand, said the prosecution would be ready to proceed on 1 July. Under these circumstances, the government is accountable for 94 days.[3] R.C.M. 707.

The military judge held the prosecution failed to show the government acted with reasonable diligence. The judge focused on two time periods, 5 April through 24 May[4] and 14 June through 1 July in concluding that Art. 10, UCMJ, was violated. While we have serious reservations about the validity of the military judge's findings of fact regarding these two periods of time, we need not decide whether those findings were clearly erroneous because, even accepting the judge's findings of fact, we hold the judge was incorrect in concluding from his findings of fact that there was insufficient evidence to show that the government acted with reasonable diligence. We hold the government did act with reasonable diligence. *Birge*, 52 M.J. at 211.

In addressing the Sixth Amendment right to a speedy trial, the Supreme Court established a balancing test involving four factors: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), *quoted in Birge*, 52 M.J. at 212.

Applying these factors to this case, we make the following observations. We have said the length of delay attributable to the government is 94 days. *See* R.C.M. 707(b)(1). This is within the President's directive of 120 days in R.C.M. 707. The reason for the delay was processing the physical evidence through the necessary scientific testing and then moving the case through all the steps required by the UCMJ

---

**2.** The chronology in Appendix I indicates that arraignment was "Day 123." While literally correct, R.C.M. 707(b)(1) excludes the day pretrial restraint was imposed for accountability under the rule.

**3.** The chronology in Appendix I indicates that the government was ready to proceed to trial on

"Day 95." As in footnote 2, under R.C.M. 707(b)(1), the accountable days are 94.

**4.** Although the military judge used the words "through 24 May," he likely meant 23 May because the chronology shows that 23 May was the last day of the hard drives testing and report rendering by OSI.

to take the case to trial by general court-martial. While the defense demanded "immediate trial" on 14 June 2002, six days later they withdrew that demand by agreeing to a 29 July 2002 trial date after the prosecution said they would be ready to go to trial on 1 July 2002. As found by the military judge, the only prejudice to the accused from the "delay" has been his pretrial confinement.

The Supreme Court has provided important guidance on interpreting the factor of prejudice to the accused:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Barker v. Wingo*, 407 U.S. at 532, 92 S.Ct. 2182.

The Court pointed out that the four factors are related and must be considered together with other relevant circumstances in the "difficult and sensitive balancing process." *Id.* at 533, 92 S.Ct. 2182. We believe that the "other relevant circumstances" include circumstances unique to the military, which includes the requirements of Art. 10, UCMJ.[5]

Our superior court has said that it is appropriate to "consider the *Barker v. Wingo* factors—in the context of Article 10's 'immediate steps' language and 'reasonable diligence' standard—in determining whether a particular set of circumstances violates a ser-

vicemember's speedy trial rights under Article 10." *Birge*, 52 M.J. at 212.

But the Supreme Court has acknowledged that, fundamentally, the concept of the right to speedy trial is nebulous. "[T]he right to speedy trial is a more vague concept than other procedural rights. It is, for example, impossible to determine with precision when the right has been denied. We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate." *Barker v. Wingo*, 407 U.S. at 521, 92 S.Ct. 2182. "[I]n large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself." *United States v. Ewell*, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966), *quoted in Barker v. Wingo*, 407 U.S. at 521, n. 15, 92 S.Ct. 2182.

We believe it is important to reflect on this Supreme Court guidance when interpreting the requirement of "immediate steps" in Art. 10, UCMJ. From a temporal perspective, we view "immediate steps" to be the first phase of the required "reasonable diligence" spoken of by our superior court. *See Birge*, 52 M.J. at 211 and cases cited therein. In short, reasonable diligence requires "immediate steps." This view of "immediate steps" is supported by the legislative history on Art. 10, UCMJ.

Subcommittee No. 1 of the House of Representatives Committee on Armed Services met at 1000 on 21 March 1949 and began the day's work with consideration of Article 10 of the proposed Uniform Code. The following exchange of ideas occurred:

> Mr. Brooks. Is there any comment on that article?
> Mr. Anderson. Well, Mr. Chairman, is this the article in the bill that has to do with the length of time that a man will be

---

5. While there is no evidence in this case of the impact of military operations on the processing of this case, as a general proposition, we consider that such operations could be an important part of the military circumstances relevant in the balancing process described in *Barker v. Wingo* and in determining whether the government acted with reasonable diligence under Art. 10, UCMJ.

placed in confinement and held there pending his trial?

Mr. Larkin. It is one of the articles, Mr. Anderson, that touches on that point. The last sentence in it is pertinent—

When any person subject to this Code is placed in arrest or in confinement prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or to dismiss the charges and release him.

That is a direction to the authorities in charge to go forward. It says "immediate steps."

Mr. Anderson. What does that mean?

Mr. Larkin. Well, that means that the charges against the accused must be considered and the authorities who have the responsibility to consider them must decide whether or not they are going to order a pretrial investigation and process the case and whether the pretrial investigation shows that the crime has probably been committed and he is the man and to go ahead and try him.

Mr. Anderson. Well, is there anything else in the code that sets any sort of a time limit on the length of time that a man can be held in the brig pending his trial?

Mr. Larkin. There is no provision as to hours or days. There are several other provisions which direct speedy trials. However, there is one article that provides in peacetime that you cannot try a man without his consent in less than 5 days after you have served him with the charge in a general court and 3 in a special.

The idea was to provide that there be a speedy trial but not one that is so speedy that the man cannot prepare his own defense.

Mr. Anderson. Well, I think of the cases that occurred—I think numerous times during the war and probably in all branches of the service, although I was more familiar with the Navy side of it where a fellow was put in the clink and held there for weeks, sometimes months, before he was brought to trial.

I am just wondering if we cannot do something in this code to insure the fact that the man is given a trial within a certain length of time or as I understand the California law reads it is that if he is not brought to trial within 30 days the charges are dismissed and he is released, because a man can be held for many weeks even under the terms of this code and in spite of the fact that it says "immediate" if the exigencies of the occasion are that he is a long way from the mainland or that he is confined aboard ship, it does not work out.

I am just wondering what is being done to be sure that he is brought to trial within a certain length of time so he is not held in confinement for too long a time prior to the confinement.

Mr. DeGraffenried. One thing we have to consider is this, though. You take the case where a prosecuting witness might be seriously injured in some kind of a fray. The man charged with assaulting him may be held and this man assaulted is in the hospital and they could not use him as a witness until he got well to come to court unless they got his deposition which is not quite as satisfactory as having a man on the witness stand where you can hear his testimony and see his demeanor and give the defense counsel an opportunity for cross-examination.

And if we fix a definite time limit there, why it might be that a case would have to go out before this prosecuting witness was able to come to court. And where we use this word "immediate" here, that is like using "forthwith," which means to go ahead. I believe that is just about as close as we can get to it.

If we fix a definite time there, this prosecuting witness might not be able to get there.

Uniform Code of Military Justice: Hearings on H.R. 2498 Before Subcomm. No. 1 on Armed Services, 81st Cong. 905–06 (1949).

■ The requirement that "immediate steps shall be taken" does not mean the government must bring court-martial charges against a member being held in pretrial confinement before collecting the evi-

dence to conduct a successful prosecution. Nor does it mean that investigators and prosecutors must busy themselves with case preparation while they are waiting for the evidence necessary to understand the case.[6] "Brief periods of inactivity in an otherwise active prosecution are not unreasonable or oppressive." *United States v. Tibbs*, 35 C.M.R. 322, 325, 1965 WL 4672 (C.M.A.1965).

█ In Captain Plants' case, we hold the government took the immediate steps required by Art. 10, UCMJ. After gathering substantial physical evidence that required scientific testing and after placing the accused in pretrial confinement, the government took steps to have the seized physical evidence scientifically analyzed. The evidence was sent to three separate locations around the world for testing. The Medical Group at Andersen AFB received notice of the positive result of the urinalysis done at the Air Force Drug Testing Laboratory at Brooks AFB, Texas, on day 19 of the accused's pretrial confinement. Ten days later, the U.S. Army Criminal Investigation Laboratory (USACIL), in Georgia, issued a report, which indicated that amphetamine was found on some of the items tested. Twenty-seven days later, the Air Force Office of Special Investigations (OSI) at Yokota Air Base, Japan, completed its testing and issued a report on the testing of the computer hard drives, which revealed sexually explicit materials on one of the drives. All of the scientific testing done in the case was completed within 56 days of the accused's pretrial confinement. Under these circumstances, the military judge erred in holding the government failed to act with reasonable diligence during the period 5 April through 23 May 2002. We hold the government proceeded with reasonable diligence throughout this time. *Birge*, 52 M.J. at 211 and cases cited therein.

█ The military judge held there was reasonable diligence by the government from 24 May 2002 through arraignment with the exception of the period 14 June to 1 July 2002. Again, the military judge erred in

holding the government failed to act with reasonable diligence during the period 14 June to 1 July 2002. We hold the government proceeded with reasonable diligence throughout this time. *Id.*

The Article 32 investigation report was provided to the staff judge advocate for the special court-martial convening authority and the defense demanded "immediate trial" on 14 June 2002. The government's activity during the period of 14 June to 1 July 2002 was an obvious effort by the prosecution to accommodate the defense's demand and to allow for a predicted period of time for the coordination necessary to accomplish the numerous procedural safeguards required by the UCMJ and *Manual For Courts–Martial* to move the case to referral by the general court-martial convening authority. These procedures included the written advice of the convening authority's staff judge advocate as required by Article 34, UCMJ, 10 U.S.C. § 834, subsequent service of the referred charges upon the accused and the five-day waiting period between service of charges and trial as required by Article 35, UCMJ, 10 U.S.C. § 835. Predicting that this could all occur within two weeks, and that the prosecution witnesses would be available by 1 July, is not only reasonable diligence, it is commendable diligence.

We hold there was no violation of speedy trial in this case, either under Art. 10, UCMJ, or under the Constitution of the United States. Therefore, the appeal by the United States pursuant to Art. 62, UCMJ, is granted. The decision of the military judge dismissing the charges and specifications for a violation of speedy trial under Art. 10, UCMJ, is set aside. The case is remanded to the trial court for further proceedings.

## APPENDIX I

The military judge incorporated the following chronology in his essential findings of fact:

> 29 Mar 02: Accused is apprehended. He admits to writing letter to Ms. R, am-

---

6. Thus, we need not address the issue whether the military judge abused his discretion by refusing to allow the trial counsel to explain in detail

what the government was doing during the periods of "inactivity."

phetamine and methamphetamine use; amphetamine possession; and misuse of Ms. R's medical information. Accused provides urine sample. Alleged drug paraphernalia is seized, as is his office computer. Accused is placed in pretrial confinement. (Day 1)

30 Mar 02: First date seized items could be sent for testing. (Day 2)

4 Apr 02: Special Court–Martial Convening Authority appoints a Pretrial Confinement Review Officer. The pretrial confinement hearing is held. (Day 7)

5 Apr 02: Pretrial Confinement Review Officer publishes his report. Accused is continued in confinement. (Day 8)

12 Apr 02: Brooks Laboratory reported a positive result for amphetamine based upon the urinalysis provided by the accused. (Day 15)

16 Apr 02: Andersen AFB Medical Group receives notification of urinalysis result. (Day 19)

26 Apr 02: USACIL renders report, indicating amphetamine found on at least some of the items tested.

14–23 May 02: Computer testing accomplished at Yokota and report rendered. (Days 47–56)

24–30 May 02: Base legal office personnel draft charges, coordinate with defense counsel regarding likely preferral date, and discuss possible dates for Article 32 hearing. Parties agree on 6 June 02 Article 32 hearing. Charges reviewed by the legal office for the General Court–Martial Convening Authority prior to preferral. Travel arrangements made for the Article 32 investigation in California. (Days 57–63)

31 May 02: Charges preferred; Article 32 Investigating Officer appointed. (Day 64)

3–4 June 02: Parties traveled to Miramar. (Days 67–68)

5 June 02: Article 32 hearing begins. (Day 69)

6 June 02: Hearing concludes: parties begin return travel. (Day 70)

8 June 02: I.O. returns to Guam. (Day 72)

9–13 June 02: I.O. prepares report. (Days 73–77)

11 June 02: Court holds dry docketing conference with counsel at Andersen AFB; parties agree to 24 July 02 trial date. (Day 75)

14 June 02: I.O. report to Special Court–Martial Convening Authority's Staff Judge Advocate; Defense demands immediate trial. (Day 78)

19 June 02: Government responds to demand; asserts they will be ready to proceed to trial on 1 July 02. (Day 83)

20 June 02: Counsel for both sides submit memoranda agreeing to a trial date of 29 July 02. (Day 84)

21 June 02: Charges referred to trial by general court-martial; served on accused. (Day 85)

1 July 02: Government ready to proceed to trial. (Day 95)

29 July 02: Accused arraigned. (Day 123)

APPENDIX II

The military judge made the following essential findings of fact:

1. In January 2002, the accused was assigned as a Public Health Officer at Andersen Air Force Base, Guam. On the 18th of that month, and pursuant to his duties as a Public Health Officer, the accused interviewed Ms. R. As part of the required interview, the accused inquired into Ms. R's sexual history and annotated the same in her medical records. Ms. R was under the age of eighteen at the time.

2. In February 2002, the accused called Ms. R at her home and identified himself. Ostensibly soliciting information for a professional survey, the accused asked Ms. R further, and much more pointed and detailed, questions about her sexual history. Ms. R answered the questions posed to her.

3. Several weeks later, an unidentified caller phoned Ms. R, referenced details about her sexual history, and told her that, in the future, he would be asking her to do something for him. The caller remained unidentified.

4. On 27 March 2002, Ms. R received an unmarked typed letter in the mail. It had

no return address and had a "Love" postage stamp on it. The letter, which is before the Court as an attachment to the defense motion, threatened to reveal details of Ms. R's sexual history to her father if Ms. R did not assist the drafter of the letter in framing the accused. Specifically, the letter suggested Ms. R visit the accused in his office on 29 March 2002, place methamphetimine (sic), in "Ice" form, and cash in his briefcase, and seduce the accused. Ms. R turned the letter over to her parents, and, in turn, OSI.

5. Upon receipt of the letter, OSI agents suspected that the accused, in fact, drafted the letter. Consequently, they developed a plan whereby Ms. R would keep the appointment, within certain parameters, and the OSI would surveille the meeting with closed circuit television and audio monitoring. They secured the necessary approvals, and undertook the operation, monitoring the event from the office next to the accused's.

6. On 29 March 2002, prior to Ms. R's arrival, the video surveillance captured the accused taking something out of his desk and apparently inhaling something into his nose.

7. As arranged, on 29 March 2002, Ms. R entered the accused's office. She had previously been searched by OSI and provided the drugs and cash called for in the 27 March 2002 letter. The methamphetamine was provided by the Guam Police Department, and certified as that exact substance by laboratory analysis provided with the drug by the Guam Police Department. The cash had been copied, with serial numbers recorded, before Ms. R entered the office. After entering the office, Ms. R placed the methamphetamine and cash into the accused's briefcase, as instructed in the letter. After she left, the accused secured the items from the briefcase where they had been placed. He placed the money and methamphetamine in his pockets.

8. Approximately 30 minutes later, when the accused left his office at the end of the day, he was apprehended by OSI agents. The search incident to apprehension dis-closed both the cash and the methamphetamine, carried by Ms. R, on his person. It also revealed a paper bindle in his wallet containing an orange powdery substance. Shortly thereafter, the accused consented to a search of his blood, urine, office, government and personal computers, and residence. Consequently, and shortly thereafter, the accused provided a urine sample on the same evening.

9. Pursuant to the same consent, and also on the same evening, the OSI searched the accused's office and found a variety of items. They include: a pill bottle for an Aderral (sic) prescription; a razor blade; a red and white straw with a white residue thereon; a peppermill; a scalpel; a paper funnel; and a packet of "Love," stamps, with one stamp missing.

10. After rights advisement and acknowledgement thereof, the accused agreed to answer questions. He admitted writing the letter to Ms. R and making the anonymous phone call. He admitted to using methamphetamine on four separate prior occasions with a girl at the Rose Massage Parlor in Guam. He admitted that the apparent inhalation captured on the surveillance tape was him inhaling powdered Aderral (sic). He explained that the prescription for the drug was his son's and that he had ground the pills in the peppermill and drawn the powder into lines for inhaling with the scalpel. He further explained that the paper funnel was used to place the pills into the peppermill.

11. Two computer hard drives were also seized from the accused's office. Due to a prior Article 15 received by the accused for viewing pornography on his government computer, the government determined the search of the hard drives was necessary to investigate further similar misconduct. The local OSI detachment determined examination of the hard drives was beyond their expertise here at Guam and contacted the OSI Squadron level computer forensic analysis branch at Yokota Air Base, Japan for analysis. Per Yokota's direction, the Guam OSI packaged the hard drives and shipped the same to Yokota for analysis. The local detachment chose the Yoko-

ta Squadron for this work because Yokota was the nearest office with the requisite capability within the OSI Pacific Region. There is no evidence before the Court as to when the hard drives were sent to Yokota, although, it certainly took place after 29 March 2002. There is no evidence before the Court as to the vehicle for shipment, the time routinely required for such analysis, the priority given the project, nor any special requests in this regard from the local detachment, why the test itself took nine days, a description of the testing methods employed beyond the "logical" and "physical" characterizations; the workload of the computer analysis unit, and the availability of civilian law enforcement assistance or sister service law enforcement assistance here on Guam.

12. On 29 March 2002, the accused was ordered into pretrial confinement by his Group Commander. He was confined locally at Andersen Air Force Base, Guam. On 4 April 2002, the Special Court–Martial Convening Authority appointed a Pretrial Confinement Review officer. The pretrial confinement hearing was held on that date and Captain Burton represented the accused. The Review Officer published his report on 5 April 2002. Therein, he determined that there was probable cause to believe the accused committed the alleged offenses and that continued confinement was required because of the likelihood that the accused would engage in serious criminal conduct if released and that lesser forms of restraint would be inadequate.

13. On 12 April 2002, Brooks Laboratory reported a positive result for amphetamine based upon the urinalysis provided by the accused. The Medical Group here at Guam received the notification on 16 April 2002. There is no evidence before the Court as to when the urinalysis provided by the accused was forwarded to Brooks Laboratory for analysis; the vehicle for shipment; the routine length of time embraced by such testing; the feasibility of conducting such testing in a local civilian lab or sister service laboratory in the Pacific; nor the reason for the 12 April to 16 April time lag in reporting.

14. Various items seized from the accused's office, among other items, were sent to the United States Army Criminal Investigation Laboratory, or USACIL at some point after 29 March 2002. These items included the peppermill, scalpel, and the paper funnel. On 26 April 2002, USACIL rendered a report of their findings, which indicated that amphetamine had been found on at least some of the items tested. There is no evidence before the Court as to when the items were packed and shipped, the vehicle for shipment, the routine testing time normally embraced in such tests, the priority given the samples, if any, and requests for such priority treatment, the workload at the USACIL, and the feasibility of using local law enforcement facilities or those of a sister service in the case. Given the evidence before the Court, the testing could have taken over three weeks to complete, there being no evidence of submission date nor testing duration.

15. On 23 May 2002, the Yokota OSI computer forensics unit rendered their report of testing results. The testing was accomplished during the period 14 through 23 May 2002 and revealed evidence of pornography on the accused's government computer. Also important to note is that the government had a confession, a surveillance tape and all corroboration on the drug use that they were going to develop on 29 March 2002.

16. Aside from the three scientific testing undertakings at Brooks, USACIL, and Yokota, respectively, there is no evidence before the Court of any investigative activity in this case whatsoever, from the period 30 March 2002 through 24 May 2002. Aside from the scientific testing undertakings, there is no evidence before the Court of any investigative activity by law enforcement officials, excluding judge advocates, from the period 30 March 2002 through 28 July 2002. Again, I'll note although it is important to note the government had a confession, a surveillance tape, and all corroboration on the drug use they were going to develop on 29 March 2002, that left

only pursuit of evidence of a tag-on computer pornography hunch outstanding, an offense usually disposed of by Article 15, which held up the case for nearly two months. Moreover, even if the USACIL tests were needed for corroboration, the case still lingered an additional 30 days after those results came back, waiting for action by Yokota OSI.

17. During the period 24 through 30 May 2002, base legal office personnel drafted the charges in this case. They also coordinated with defense counsel regarding likely preferral date, and discussed possible dates for a likely Article 32 hearing. As to the Article 32 hearing, the parties agreed on 6 June 2002. After the charges were drafted by base office personnel, they were reviewed by the legal office for the General Court–Martial Convening Authority prior to preferral. Additionally during this week, travel arrangements were made to get all parties to the site for the Article 32 investigation in California.

18. On 31 May 2002, the charges were preferred in this case and the Article 32 Investigating Officer was appointed. The Article 32 investigation was held at the Naval Confinement facility at Miramar, near San Diego, California, likely because the accused had been transferred there in his pretrial confinee status.[7] The parties agreed to hold the Article 32 investigation at Miramar on 6 June 2002 and began travel preparations. On 3 and 4 June 2002, the parties traveled to Miramar and the hearing began on 5 June 2002, one day early at the request of the government representative. The hearing concluded the next day and the parties began travel to return. The Investigating Officer returned to Guam on 8 June 2002, prepared his report over the next five days, and provided the same to the Special Court–Martial Convening Authority's Staff Judge Advocate on 14 June 2002.

19. On 11 June 2002, the Court held a dry docketing conference with counsel, Captains Dene and Vetter at Andersen Air Force Base, Guam. The dry docketing system is used in this Circuit as an opportunity for counsel, in situations where a case will likely go to court, to reserve a trial date with the Circuit, prior to referral, in order that counsel can make scheduling decisions regarding the trial, prior to referral, with reliance on a firm trial date after referral. In this case, and under this system, both sides agreed, on 11 June 2002, to a "dry docket" date of 24 July 2002, with a caveat by the defense. The defense agreed to the date only in terms of counsel availability, giving the Court notice that there may be forthcoming a demand for an earlier trial date, owing to the accused's status as a pretrial confinee.

20. On 14 June 2002, and the court (sic) here notes that Appellate Exhibit X reveals a mistake on the date—it says "01," the defense demanded immediate trial in this case. On 19 June 2002, the government responded, asserting they would be ready to proceed to trial on 1 July 2002. However, on 20 June 2002, counsel for both sides submitted memoranda agreeing to a trial date of 29 July 2002. Accordingly, on 20 June 2002, the dry docket date was revised to 29 July 2002.

21. On 21 June 2002, charges were referred to trial by general court-martial and served on the accused the same date. Upon referral, the status of the case, for docketing purposes became formally docketed as previously agreed.

22. The accused was arraigned on 29 July 2002.

23. I attach hereto at Appellate Exhibit XVII, and incorporate by reference herein a chronology of events as recommended by our Court Rules and our case law.

---

7. While not a part of the judge's findings, the accused was transferred to the psychiatric ward of the confinement facility at Miramar because he attempted suicide after being placed in pretrial confinement.