# United States Navy-Marine Corps Court of Criminal Appeals

———————————————

## UNITED STATES
*Appellee*

v.

## Christopher E. JENNINGS
## Staff Sergeant (E-6), U.S. Marine Corps
*Appellant*

———————————————

## No. 201700241

———————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary.

*Argued:* 25 October 2018[1]—*Decided:* 04 February 2019

———————————————

*Military Judges:*
Lieutenant Colonel Eugene H. Robinson, USMC (arraignment);
Colonel Douglas W. Gardner, USMC (trial).

*Approved Sentence:* Reduction to E-1, total forfeiture of pay and allowances, confinement for three years, and a dishonorable discharge. Sentence adjudged 13 April 2017 by a general court-martial convened at Camp Foster, Okinawa, Japan, consisting of officer members.

*For Appellant:*
Lieutenant Daniel E. Rosinski, USN (argued);
Commander Donald R. Ostrom, JAGC, USN (on brief);

———————————————

[1] We heard oral argument in this case at The Catholic University of America, Columbus School of Law, Washington, D.C.

*For Appellee:*
Lieutenant Clayton S. McCarl, JAGC, USN (argued);
Captain Brian L. Farrell, USMC (on brief).

————————————

**This opinion does not serve as binding precedent under
NMCCA Rule of Appellate Procedure 30.2.**

————————————

Before HUTCHISON, TANG, and LAWRENCE,
*Appellate Military Judges.*

HUTCHISON, Senior Judge:

A panel of officers sitting as a general court-martial convicted the appellant, contrary to his pleas, of attempted sexual assault of a child, four specifications of attempted sexual abuse of a child, attempted receipt of child pornography, and solicitation of the production of child pornography, in violation of Articles 80 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880 and 934.

The appellant raises five assignments of error (AOEs):[2] (1) the findings are factually insufficient because the government failed to prove beyond a reasonable doubt that the appellant was not entrapped; (2) the appellant was denied his right to a speedy trial because he was not arraigned within 120 days of being placed on liberty risk; (3) the trial defense counsel was ineffective for seeking confinement credit rather than asserting speedy trial rights; (4) the military judge erred in denying a challenge for cause against the appellant's executive officer; and (5) the military judge misled the members in responding to their questions related to sentencing.

Having examined the record of trial, the pleadings of the parties, and the oral argument, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ.

---

[2] We have renumbered the AOEs.

## I. BACKGROUND

In February 2015, Naval Criminal Investigative Service (NCIS) agents apprehended the appellant after he drove to a house on Kadena Air Base in Okinawa, Japan,[3] to engage in sexual acts with a 15-year-old girl—Savannah—with whom he had been chatting online. In fact, Savannah was an undercover NCIS agent looking for military personnel using the internet to solicit sex from minors.

The appellant's communications with Savannah began the previous summer when he responded via email to an advertisement on an online personal forum. The advertisement posted by the undercover agent (UC) was titled "heyy ;) – w4m" and listed Savannah's age as 18.[4] The UC responded to the appellant's email by contacting him directly using a wireless messaging application on her NCIS-provided smart tablet. Within their first exchange Savannah revealed that she was only 15-years-old:

> [Savannah]: im a little younger than my profile says [by the way]
>
> [Appellant]: How old are you? And what u looking for? ;) Cause young is ok. Can I see a pic?
>
> Just depends how young.
>
> [Savannah]: im 15
>
> [Appellant]: Ok. What are you looking for with me? Picture of you?[5]

After the UC sent the appellant a photo of her face, he further inquired what she was looking for and pointed out that the "area" of the online forum Craigslist she posted in was "rather promiscuous" and "sexual in nature."[6] The appellant pressed:

---

[3] The appellant's final communications and apprehension took place in Okinawa, Japan when he was on temporary duty there from his permanent assignment aboard Marine Corps Air Station (MCAS) Iwakuni, located at the southern end of Honshu, the main island of Japan.

[4] Prosecution Exhibit (PE) 1 at 1; Record at 375-76. The UC explained that "w4m" means "woman for man." *Id.* at 374.

[5] PE 1 at 3.

[6] *Id.* at 4.

[Appellant]: Are you wanting to be friends with me, or more than just friends? Cause how you answer determines everything. Don't want the wrong impression given.

[Savannah]: im down for watever

[Appellant]: Really? Anything? Send me a full body pic?[7]

The appellant and Savannah continued sending messages for a few days. While the appellant expressed concern over their 17-year age difference and getting in trouble for "talking" or "hanging out" with Savannah because she was a "minor," he did send her a full-length photo of himself in a Marine Corps dress uniform and continued to ask her for a full-length picture of her "body."[8] After the appellant sent his photo, there was no further communication between the UC and the appellant for nearly three months. The UC reinitiated contact with the appellant in the fall of 2014. Savannah once again reminded the appellant that she was only 15, and after approximately a week of messaging back and forth they once again ceased communicating.[9]

In February of 2015, the UC again contacted the appellant, asking him via message, "who is this."[10] After resuming communications, Savannah reminded the appellant that she was still only 15-years-old. The appellant asked if anyone would find out about their conversation, and after Savannah told him no one would, the appellant's messages turned overtly sexual. Specifically, he asked Savannah if she had ever been "physical"[11] with a man before and whether his van would be an "ok" place for the two of them to have sex.[12] The appellant told Savannah that he would be gentle during their first time having sex, promised to teach her how to perform oral sex when they met in person, coached her on how to masturbate, sent her a photograph of his genitals, asked her to take photos of her genitals and send them to him, described to her the physical acts he was fantasizing about performing on her, and ultimately arranged a specific time to meet for sex.

---

[7] *Id.* at 5.

[8] *Id.* at 6-7.

[9] The content of these messages included the appellant asking Savannah for more pictures and discussions regarding how old each of them looked in their pictures. The appellant also asked Savannah how tall she was. *See Id.* at 7-11.

[10] *Id.* at 11.

[11] *Id.* at 12.

[12] *Id.* at 13.

Following his apprehension, the appellant submitted to an interview with NCIS agents. The appellant admitted that from the beginning of his communications with Savannah he was "fishing to see how far" she was "willing to go."[13]

On the day he was apprehended, the appellant's command placed him on Class "C" liberty risk. In this status, the appellant was not permitted to leave MCAS Iwakuni, and he was not allowed to purchase or consume alcohol.[14] He continued to perform his normal duties and to work normal hours. The appellant remained in this liberty risk status for 482 days before he was arraigned.

Additional facts necessary to resolve the assigned errors are included below.

## II. DISCUSSION

### A. Entrapment

The appellant claims that he was entrapped and that, therefore, his convictions are factually insufficient.

We review questions of factual sufficiency *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (emphasis, citation, and internal quotation marks omitted). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

Entrapment is an affirmative defense in which "the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense." RULE FOR COURTS-MARTIAL (R.C.M.) 916(g), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.). For the entrapment defense to prevail, the defense has the "initial

---

[13] PE 4 at 13:45-14:06.

[14] *See* Appellate Exhibit (AE) XXXIX at 1-2.

burden of . . . show[ing] that a government agent originated the suggestion to commit the crime." *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992). Once the defense has met the initial burden, the burden shifts to the government to prove either: (1) that the "criminal design did not originate with the [g]overnment"; or (2) "that the accused had a predisposition to commit the offense . . . prior to first being approached by [g]overnment agents." *Id.* (citations and internal quotation marks omitted). "The bottom line is that entrapment has two elements: government inducement and an accused with no predisposition to commit the offense." *United States v. Howell*, 36 M.J. 354, 358 (C.A.A.F. 1993) (citations omitted).

### 1. Inducement

The first element of entrapment is an inducement by the government to commit the crime. *Howell*, 36 M.J. at 359-60. "Inducement is government conduct that creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense" and can take many forms, including fraudulent representations, threats, persuasion, coercive tactics, or even pleas "based on need, sympathy, or friendship." *United States v. Hall*, 56 M.J. 432, 436 (C.A.A.F. 2002) (citations and internal quotation marks omitted). However, there is no inducement where government agents simply provide "the opportunity or facilities to commit the crime." *Id.* at 437 (citations and internal quotation marks omitted).

The appellant argues that the UC induced him to engage in the offenses. First, he contends that because the UC placed her advertisement[15] in an overtly sexual section of Craigslist, she first introduced the subject of sex. We disagree. While the "Casual Encounters" section of Craigslist might be overtly sexual, nothing in the UC's advertisement or, more importantly, in her subsequent messages to the appellant ever introduced the subject of sex. Rather, Savannah immediately informed the appellant that she was younger than her profile indicated and the appellant responded that "young [was] ok."[16] After finding out that Savannah was only 15, the appellant persisted, asking her what she was looking for, and once he confirmed that she was "down for whatever" he requested that she send him a full-body picture.[17] An

---

[15] NCIS did not retain the original advertisement, but both the UC and her supervisory NCIS agent testified to its contents.

[16] PE 1 at 3.

[17] *Id.* at 5.

otherwise law-abiding citizen would not request a full body picture from a 15-year-old girl.

Next, the appellant argues that the UC repeatedly contacted him after their conversation lapsed. But the mere act of reinitiating contact after periods of inactivity does not constitute inducement. Both times the UC reinitiated contact with the appellant, her messages were innocuous; they were not sexual in nature and did not invite the appellant to commit a crime. Instead, her messages simply provided the appellant with "the opportunity . . . to commit the crime." *Hall*, 56 M.J. at 436-37. The Court of Appeals for the Armed Forces (CAAF) has explained that even a "government agent's repeated requests for assistance in acquiring drugs do not in and of themselves constitute the required inducement." *Howell*, 36 M.J. at 360 (citing *United States v. Mendoza-Salgado*, 964 F.2d 993, 1004 (10th Cir. 1992); *United States v. Salmon*, 948 F.2d 776, 779 (D.C. Cir. 1991); *United States v. Gunter*, 741 F.2d 151, 153 (7th Cir. 1984)). The UC's activity here—simply reinitiating contact with the appellant—falls far short of the government action condoned by the CAAF in *Howell*.

Finally, the appellant claims that the UC badgered him into driving to her house even after he had indicated he did not want to do so on that occasion. Specifically, the appellant argues that after he had set up a time to meet the UC, he changed his mind and "told Savannah that he was not going to visit," but she nevertheless "induced him to violate the law with a "'plea[] based on need, sympathy or friendship:'"[18]

> [Appellant]: I just laid down. Can we do this another day? Been writing a paper all night[.]
>
> [Savannah]: I can't[.] idk when I can[.] Ur not coming?
>
> [Appellant]: I ca[n']t drive. I can barely[ ]keep my eyes open[.]
>
> . . . .
>
> [Savannah]: I just showered for nothing[.] I guess I'll [talk to you later] bye[.]
>
> [Appellant]: Sorry
>
> [Savannah]: I said I didn't won't [sic] no drama!

---

[18] Appellant's Reply Brief of 9 July 18 at 21 (alteration in original) (citations omitted)(quoting *United States v. Poehlman*, 217 F.3d 692 (9th Cir. 2000).

[Appellant]: Ok. I['·]ll shower and grab some caffeine. Is that what you want?

[Savannah]: Duh

[Appellant]: K[.] Where am I going?[19]

The text exchange shows only that the appellant sought to postpone his previously scheduled early morning rendezvous with Savannah because he had been up all night and was too tired. It was the appellant, not Savannah, who first proposed they would meet and have sex. That the UC, in response to the appellant's last-minute cancellation, expressed some disappointment does not amount to inducement. Rather, the fact that the appellant was motivated to act merely because Savannah seemed *disappointed* reveals his predisposition to commit the crimes for which he was convicted. Based on these facts, we conclude the appellant was not induced and that government agents merely provided him an opportunity to commit the offenses.

*2. Predisposition*

"Evidence that 'a person accepts a criminal offer without being offered extraordinary inducements . . . demonstrates his predisposition to commit the type of crime involved.'" *United States v. Bell*, 38 M.J. 358, 360 (C.M.A. 1993) (quoting *United States v. Evans*, 924 F.2d 714, 718 (7th Cir. 1991) (additional citation omitted)). When this willingness to commit a crime is exhibited, the actions of government agents along with the person's predisposition prior to contact should be considered to ensure this predisposition was not the result of the government influence. *See United States v. Jacobson,* 503 U.S. 540, 553 (1992).

The appellant contends that there is no evidence of any predisposition; the appellant had no criminal background, and the government failed to show that he had ever previously sought out underage individuals for sex or that he ever searched for or looked at child pornography. Arguing he lacked the "inclination, willingness, or readiness to engage in the illegal activity for which he is charged," the appellant avers his conviction should be overturned.[20]

---

[19] PE 1 at 35-36.

[20] Appellant's Brief of 1 Feb. 2018 at 29-31 (quoting *United States v. Kemp*, 42 M.J. 839, 845-46 (N-M. Ct. Crim. App. 1995).

Again, the appellant's accelerating pursuit even after being told he was conversing with a 15-year-old girl demonstrate his predisposition. When Savannah told him that she was "a little younger than my profile says" he replied, "young is ok [sic]. . . . Just depends how young."[21] When Savannah answered she was 15-years-old, the appellant asked her, "What are you looking for with me?" and solicited a picture of her before she could respond.[22] Even after the appellant knew Savannah was only 15-years-old, and without any "extraordinary inducements," the appellant continued to pursue a sexual relationship with her, expressing concern that he could get in trouble if caught. Yet, the appellant initiated the sexual conversation with Savannah, described the sexual acts he would perform on her, requested pictures from her, sent her pictures of his penis, and arranged to meet with her to have sex. After his apprehension, the appellant admitted that his intent in going to meet Savannah was to have sex. His interactions with Savannah displayed both a readiness and willingness to commit the offenses. This is not the behavior of an otherwise law-abiding citizen or a person undisposed to committing sexual acts with minors.

**B. Speedy Trial**

The appellant contends for the first time on appeal, that the 482 days[23] he spent on liberty risk "C" prior to his arraignment violated his right to a speedy trial under R.C.M. 707. Because the appellant failed to preserve this issue at trial with a timely motion to dismiss, we conclude that he has waived his right to a speedy trial.

*1. Waiver*

The Rules for Courts-Martial make clear that the burden is on the appellant to raise speedy trial issues at trial and that a failure to do so may result in waiver. *See* R.C.M. 707(e), Discussion; R.C.M. 905(e); R.C.M. 907(b)(2)(A). Rule 907(b)(2)(A) permits the appellant to move to dismiss the charges for lack of speedy trial at any time until final adjournment. Rule 905(e), in turn, provides that "failure" to raise such motions to dismiss "before the court-martial is adjourned . . . shall constitute waiver." Consequently, by failing to

---

[21] *Id.* at 3.

[22] *Id.*

[23] The appellant incorrectly claims 513 days between his assignment to Class "C" Liberty Risk on 25 February 2015 and his arraignment on 21 June 2016. *See* Appellant's Brief at 37, n.179.

raise an R.C.M. 707 speedy trial issue prior to final adjournment, the appellant waived this issue.

Even when a rule refers to waiver, it may instead mean "forfeiture." *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017). "Forfeiture is the failure to make the timely assertion of a right, [while] waiver is the intentional relinquishment or abandonment of a known right." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (citations and internal quotation marks omitted). We review a forfeited issue for plain error, but a "valid waiver leaves no error to correct on appeal." *Ahern*, 76 M.J. at 197. While our previous decisions have not always been consistent when dealing with speedy trial issues raised for the first time on appeal,[24] we believe recent decisions by our superior court support the application of waiver.

In *Ahern,* the CAAF looked to the plain language of MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 304(f)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.), observed that the rule did "not mention plain error review" and held, instead, that the rule "unambiguously provides that any claim arising under [the rule] is waived absent objection." *Ahern,* 76 M.J. at 197. In reaching this conclusion, the court noted that other rules within the Manual for Courts-Martial explicitly provided for plain error review.[25] Looking to the plain language in R.C.M. 905(e) and the discussion following R.C.M. 707(e),

---

[24] *See United States v. Olinger*, 45 M.J. 644, 649 (N-M. Ct. Crim. App. 1997) (holding R.C.M. 707 does not apply to a sentence-only rehearing, but announcing in *dicta*, that even if it did, the appellant's "failure to raise it at his sentencing rehearing" waived the issued); *United States v. Evans*, No. 9300108, 1995 CCA LEXIS 439, at *7-8 (N-M. Ct. Crim. App. 7 Feb. 1995) (unpub. op.) (holding that appellant's R.C.M. 707 speedy trial issue was waived because an objection to a "sham" arraignment was insufficient to preserve the issue); *United States v. Bolerjack*, No. 9801500, 1999 CCA LEXIS 244, at *5 (N-M. Ct. Crim. App. 31 Aug. 1999) (unpub. op.) (rejecting application of waiver and applying plain error review following appellant's failure to raise an R.C.M. 707 motion at trial); *United States v. Scamahorn*, No. 200201583, 2006 CCA LEXIS 71, at *9-10 (N-M. Ct. Crim. App. 27 Mar. 2006) (unpub. op.) (reviewing *de novo* the appellant's unpreserved R.C.M. 707 claim in order to resolve a related claim of ineffective assistance of counsel); *see also United States v. McFadden,* No. ACM 38597, 2015 CCA LEXIS 520, at *19 n.5 (A.F. Ct. Crim. App. 18 Nov. 2015) (unpub. op.) ("In the absence of any evidence that Appellant knowingly declined to assert [his R.C.M. 707] claim at trial, we consider it forfeited and not waived.").

[25] *See, e.g.,* R.C.M. 920(f) (providing for "waiver" but only "in the absence of plain error"); *see also United States v. Payne,* 73 M.J. 19, 23 & n.3 (C.A.A.F. 2014) (applying a plain error analysis to R.C.M. 920(f), which states that the failure to object constitutes waiver of the objection in the absence of plain error).

there is also no mention of "plain error review." Rather, R.C.M. 905(e)—like MIL. R. EVID. 304(f)(1)—simply states that an R.C.M. 707 speedy trial motion "must be raised before the court-martial is adjourned" and "failure to do so shall constitute waiver."[26]

In *United States v. Swift*, 76 M.J. 210 (C.A.A.F. 2017), the CAAF held that the failure to move to suppress a confession before trial under R.C.M. 905(b)(3) permanently waived the issue under R.C.M. 905(e). *Id.* at 217-18. Last term, in *United States v. Hardy*, 77 M.J. 438 (C.A.A.F. 2018), the CAAF was once again called upon to examine the use of the term "waiver" in R.C.M. 905(e) and acknowledged that "[s]ome older cases have reviewed issues 'waived' under R.C.M. 905(b) and (e) for plain error, suggesting that the 'waiver' should be treated as forfeiture." *Id.* at 441 (citing *United States v. Reist*, 50 M.J. 108, 109-10 (C.A.A.F. 1999)). But citing *Swift* and the plain language of the rule, the CAAF held that an appellant's failure to raise an unreasonable multiplication of charges motion prior to the entry of pleas, as required by R.C.M. 905(b)(2), permanently waived the issue on appeal.

The appellant's case is similar to *Swift* and *Hardy*. R.C.M. 905(e) makes clear that any motion for relief under R.C.M. 707 "must be raised before the court-martial is adjourned" and "failure to do so shall constitute waiver." The court relied on this same language in *Swift* and *Hardy*. We are also mindful that in *Hardy* the appellant entered an unconditional guilty plea and the CAAF noted that the "result"—that Hardy had waived vice forfeited his claim—was "also required by the general principle of criminal law that an unconditional plea of guilty waives all nonjurisdictional defects at earlier stages of the proceedings." *Hardy*, 77 M.J. at 442 (citation and internal quotation marks omitted); *see also* R.C.M. 707(e); *United States v. Tippit*, 65 M.J. 69, 75 (C.A.A.F. 2007) (citation and internal quotation marks omitted) ("Under R.C.M. 707(e), an unconditional plea of guilty which results in a finding of guilty waives any speedy trial issue as to that offense under the Rule."). But given the CAAF's reliance on *Swift*—a case in which the appellant plead-

---

[26] We recognize that the President changed R.C.M. 905(e) to explicitly state that failure to object is forfeiture and not waiver. *See* Exec. Order 13,825, 83 Fed. Reg. 9,889, 9,984 (1 Mar. 2018); RULE FOR COURTS-MARTIAL (R.C.M.) 905(e), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2019 ed.) (stating that failure to raise a motion that "must be raised before the court-martial is adjourned . . . shall constitute forfeiture, absent an affirmative waiver"). But the President's change to R.C.M. 905(e) did not take effect until 1 January 2019 and was not applicable at the time of the appellant's trial.

ed not guilty—and the plain language analysis of R.C.M. 905(e), we are compelled to conclude that waiver applies to this case.

We recognize, of course, that our "complete appellate review under Article 66, UCMJ" requires that we "determine whether to leave [the appellant's] waiver intact." *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016). In this case, the appellant contends that any waiver conditioned upon the failure of his trial defense team to raise a speedy trial motion constitutes ineffective assistance of counsel.[27] Therefore, as matter of judicial economy, and in order to evaluate the appellant's ineffective assistance of counsel claim, we will analyze the merits of the appellant's R.C.M. 707 speedy trial claim.

*2. Merits*

R.C.M. 707(a)(2), provides, in pertinent part, that an "accused shall be brought to trial within 120 days after . . . [t]he imposition of restraint under R.C.M. 304(a)(2)–(4)." Failure to comply with the rule results in dismissal of the affected charges. R.C.M. 707(d). "Thus, the duty imposed on the [g]overnment by R.C.M. 707 is to arraign an accused within 120 days of . . . [the imposition of restraint], or face dismissal of the charges. The duty is no more and no less, and is satisfied once an accused is arraigned." *United States v. Cooper*, 58 M.J. 54, 59 (C.A.A.F. 2003) (footnote omitted).

"Restriction in lieu of arrest" is one type of restraint that triggers the R.C.M. 707 120-day clock. Restriction in lieu of arrest is the "restraint of a person by oral or written orders directing the person to remain within specified limits; a restricted person shall, unless otherwise directed, perform full military duties while restricted." R.C.M. 304(a)(2). The appellant argues that his placement on Liberty Risk "C" was tantamount to restriction in lieu of arrest and triggered the 120-day clock under R.C.M. 707.

The government counters, however, that the appellant's liberty risk status was a "form of administrative condition on liberty" and not a form of restraint.[28] "Conditions on liberty are imposed by orders directing a person to

---

[27] At arraignment, the appellant was represented by a civilian defense counsel and a detailed military defense counsel. After the civilian defense counsel, an Army Reserve officer, was recalled to active duty, the appellant requested that the civilian defense counsel serve as his Individual Military Counsel (IMC). That request was approved and both the IMC and detailed defense counsel represented the appellant. For ease of reading, throughout the opinion, we refer to the IMC and detailed defense counsel, collectively, as the trial defense team.

[28] Government Brief of 1 June 2018 at 24.

do or refrain from doing specified acts" and do not trigger the R.C.M. 707 120-day clock. R.C.M. 304(a)(1). Likewise, nothing in R.C.M. 304 "prohibits limitations on a servicemember imposed for operational or other military purposes independent of military justice[.]" R.C.M. 304(h). To be sure, when overseas commanders impose necessary restraints on service members to protect foreign relations, the R.C.M. 707 clock is not triggered. *See United States v. Bradford*, 25 M.J. 181 (C.M.A. 1987); *United States v. Russell*, No. 201300208, 2014 CCA LEXIS 210, at *9 (N-M. Ct. Crim. App. 31 Mar. 2014) (unpub. op.) (assignment to liberty risk imposed to protect foreign relations and to avoid international incidents constituted "conditions on liberty" under R.C.M. 304(a)(1) and did not trigger R.C.M 707 speedy trial clock). But, "where the evidence supports a conclusion that the primary purpose of the command in imposing . . . conditions on [an appellant's] liberty is related to an upcoming court-martial, R.C.M. 707 applies." *Bradford*, 25 M.J. at 186-87. "[T]he test is "whether the primary purpose in imposing conditions on liberty is to restrain [the appellant] prior to trial in order to assure his presence at trial or to avoid interference with the trial process." *Id.* at 186. In applying this standard, we ask "whether the same conditions would have been imposed, even if no trial by court-martial were in prospect." *Id.*

In "a case involving a speedy-trial claim under R.C.M. 707, . . . 'whether an accused received a speedy trial is a legal question that is reviewed de novo.'" *Cooper*, 58 M.J. at 58 (quoting *United States v. Doty*, 51 M.J. 464, 465 (C.A.A.F. 1999)). "The military judge's findings of fact are given substantial deference and will be reversed only for clear error." *Doty*, 51 M.J. at 465 (citations and internal quotation marks omitted).

Although no R.C.M. 707 motion was made at trial, the trial defense team did seek relief for unlawful pretrial punishment under Article 13, UCMJ. As part of that motion, the trial defense team presented the liberty risk program order and the paperwork documenting the appellant's assignment to Liberty Risk "C."[29] The government presented evidence regarding MCAS Iwakuni's amenities and the testimony of one of the appellant's supervisors. The military judge's findings of fact related to the Article 13, UCMJ, motion are instructive to the issue presented here—whether the appellant's liberty risk conditions were tantamount to restriction in lieu of arrest.

---

[29] The appellant was later removed from liberty risk "C" and assigned to Tier III liberty status, an apparent distinction in title only and we refer to liberty risk "C" throughout.

The military judge found that given the nature of the charges against him, the appellant posed a risk within the meaning of the liberty risk order.[30] In making this determination, the military judge found it significant that the appellant admitted in his interrogation with NCIS, that in addition to chatting online with Savannah, he had also engaged in a chat, with an eye toward meeting for sex, "with host nation people."[31] The military judge found that this evidence "indicate[d] . . . the restriction was a reasonable condition on [the appellant's] liberty."[32] The military judge also found that the appellant had "unfettered access to the base, something not possessed by those members incarcerated;" he had "[a]ccess to restaurants, clubs, theater, bowling."[33] The appellant had the opportunity as a staff non-commissioned officer (SNCO) to go off-base for command functions and while restricted to base "was not required . . . to be in uniform," was "not required to check in with the duty NCO," and "was given the same 72 and 96 hour liberties [afforded to] other members."[34] The military judge rejected the trial defense counsel's assertion that the appellant's command placed him on liberty risk "C" as a "subterfuge" to avoid the appellant earning pretrial confinement credit. Rather, the military judge found no "ill intent" on the part of the appellant's command.[35]

The military judge concluded that there were gaps in a few of the successive 30-day liberty risk orders issued to the appellant and that the hearings held to re-examine the appellant's liberty risk status were "pro forma."[36] As a result, the military judge awarded the appellant 108 days of pretrial con-

[30] "A 'liberty risk' is defined as a uniformed member whose Commanding Officer has determined that he/she poses a threat to maintaining positive foreign relations [sic]." AE XLII at 3.

[31] Record at 626; *see also* PE 4. The appellant admitted that he engaged in a separate conversation with a local Japanese woman after he responded to her Craigslist advertisement, but terminated his correspondence when he learned that the individual was a prostitute.

[32] Record at 626.

[33] *Id.* at 627.

[34] *Id.* at 627-28.

[35] *Id.* at 629.

[36] *Id.*

finement credit.[37] Notably, however, the military judge declined to give the appellant any credit pursuant to *United States v. Mason*, 19 M.J. 274 (C.M.A. 1985), or *United States v. Allen*, 17 M.J. 126 (C.M.A. 1984), because the appellant was "not restricted to his barracks room like most of those cases."[38]

Finding no clear error in the military judge's findings of fact, we adopt them. The military judge found, and we agree, that the primary purpose behind placing the appellant on liberty risk "C" was because he posed a risk to foreign relations due to the serious nature of his alleged crimes and the fact that he admitted to answering a Japanese woman's online advertisement, with an eye toward meeting up for sex.[39] Thus, the commander was aware that the appellant—a married SNCO—attempted to meet both a 15-year-old dependent living onboard Kadena Air Base and a civilian Japanese woman, for sex. These facts, taken together, made it reasonable for the commander to believe the appellant posed a risk to foreign relations and made it reasonable for the commander to place the appellant on liberty risk "C." The limitations placed on the appellant's liberty for an operational or military purpose besides military justice—to promote foreign relations with the host nation—are exactly the type of limitations contemplated under R.C.M. 304(h).

Moreover, the appellant was not required to be in uniform when off-duty, and was granted the same liberty, albeit restricted to base, as any other Marine. Indeed, the restraints placed upon the appellant—to remain on base and to refrain from drinking alcohol—were moral rather physical. We find that these moral restraints were reasonable conditions on the appellant's liberty and would have been imposed and continued even if the appellant was not facing court-martial charges. Consequently, we conclude that the appellant was not in a restriction in lieu of arrest status within the meaning of R.C.M. 304(a)(2). Therefore, the R.C.M. 707 clock did not start until charges were preferred. *See* R.C.M. 707(a)(1). Since the accused was arraigned within

---

[37] *Id.* The military judge awarded 23 days' credit for "gaps that the command did not comply with" the Liberty Risk Order by failing to timely reissue orders to the appellant, and 85 days' credit for holding pro-forma hearings.

[38] *Id.* at 633

[39] Although the appellant ceased his text message conversation with this person and did not meet her for sex, he told NCIS he did so because he learned the woman was a Japanese prostitute.

120 days of the preferral of charges,[40] he was not denied his right to a speedy trial under R.C.M. 707.

## C. Ineffective Assistance of Counsel

As we noted above, the appellant alleges that his trial defense team provided ineffective assistance because they failed to assert his speedy trial rights under R.C.M. 707. **Error! Hyperlink reference not valid.Error! Hyperlink reference not valid.**We analyze ineffective assistance of counsel claims under the test outlined by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prove ineffective assistance of counsel, the appellant must show that his trial defense team's performance was deficient and that the deficiency deprived him of a fair trial. **Error! Hyperlink reference not valid.***United States v. Garcia*, 59 M.J. 447, 450 (C.A.A.F. 2004). "When reviewing ineffectiveness claims, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant.' Rather, '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.'" *United States v. Datavs*, 71 M.J. 420, 424-25 (C.A.A.F. 2012) (alteration in original) (quoting *Strickland*, 466 U.S. at 697).

With respect to *Strickland's* prejudice prong, when an allegation of ineffective assistance of counsel is based on a failure to make a motion, the appellant "must show that there is a reasonable probability that such a motion would have been meritorious." *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (citations and internal quotation marks omitted); *see also United States v. Flack*, 47 M.J. 415, 417 (C.A.A.F. 1998) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)).

As discussed above, the appellant's placement in a liberty risk status did not trigger the R.C.M. 707 clock. As a result, any R.C.M. 707 motion filed by the appellant's trial defense team would not have been meritorious. Therefore, the appellant suffered no prejudice.

## D. Challenge For Cause

The trial defense team challenged Major H for cause, claiming both actual and implied bias. Major H was an aviation supply officer assigned to the appellant's command, and, while in the process of taking over as squadron executive officer, he attended legal briefs from which he remembered seeing the

---

[40] There were a total of 36 days of excludable delay. *See* Preliminary Hearing Officer's Report of 15 Apr 16 at 11; Preliminary Hearing Exhibit 3 at 1.

appellant's name and learning that the appellant was on legal hold and was pending court-martial. Major H stated that he did not know anything about the charges and stated that he approached the case with a "blank slate."[41] The military judge denied the appellant's challenge for cause. The appellant then elected not to exercise his peremptory challenge against any member.

Failure to exercise a peremptory challenge against any member waives further review of a challenge for cause. R.C.M. 912(f)(4); *United States v. Medina*, 68 M.J. 587, 592 (N-M. Ct. Crim. App. 2009); *United States v. Leonard,* 63 M.J. 398, 402-03 (C.A.A.F. 2006). Therefore, this issue is without merit.

### E. Sentencing Instructions

During deliberations on sentencing the members asked the military judge whether the appellant was "on class 'C' liberty restriction, tier 3 liberty, or just restricted to base?"[42] After discussing a potential answer with the parties—and declining the trial defense team's request to inform the members that the appellant spent "732 days"[43] on liberty risk "C"—the military judge provided the members with the following response:

> And the answer is "yes." Staff Sergeant Jennings was on liberty risk "C" for which I, the military judge, in a legal decision, have granted him a 108 days credit. However, you do not have the evidence before you on the conditions of that specific liberty condition; therefore it should not be a consideration in your sentencing decision; okay? I made a legal ruling as to that particular issue.[44]

The appellant argues that this answer misled the members because it "implies that there was [sic] only 108 days of restriction."[45] The appellant also contends that this answer instructs the members that they should not consider the appellant's liberty conditions—and "the fact that he spent 732 days under these conditions" without any "misconduct or infractions"—in their

---

[41] Record at 138.

[42] AE XLVIII.

[43] Record at 734. Although arraigned after 482 days on Liberty Risk "C," by the time the appellant was sentenced, he had spent 732 days restricted to MCAS Iwakuni.

[44] *Id.* at 744-45.

[45] Appellant's Brief at 41.

sentencing decision.[46] We will analyze this argument using the two appropriate standards: one which reviews the propriety of the instruction *actually given,* and one which evaluates the military judge's *rejection* of a proposed instruction. We begin by evaluating the propriety of the instruction given.

A military judge is required to "give the members appropriate instructions on sentence." R.C.M. 1005(a). When responding to a members' question, "it is appropriate for the judge to answer if he . . . can draw upon a body of information that is reasonably available and which rationally relates to the sentencing considerations in [R.C.M.] 1005(e)(5)." *United States v. Duncan*, 53 M.J. 494, 499-500 (C.A.A.F. 2000). The military judge's authority includes the discretion to "instruct the members of the Article 13 credit and how it would be credited." *United States v. Barnett*, 71 M.J. 248, 252 (C.A.A.F. 2012). Thus, we review issues concerning non-mandatory instructions—such as instructions involving Article 13, UCMJ, credit—for an abuse of discretion. *United States v. Forbes*, 61 M.J. 354, 358 (C.A.A.F. 2005) (citing *United States v. Damatta-Olivera*, 37 M.J. 474, 478 (C.M.A. 1993)). Under the circumstances of this case, we hold that the military judge did not abuse his discretion when instructing the members that the appellant was entitled to 108 days of confinement credit.

Furthermore, we reject the appellant's argument that the instruction inappropriately directed the members to disregard appropriate sentencing evidence. The trial defense team did not present evidence on the specific conditions of liberty risk. But the appellant's unsworn statement described the hardship his family endured during their separation and noted that the appellant had "been confined to the base for nearly two years, which sounds an awful lot like probation. The only thing missing has been a tracking device on his ankle."[47] Although the military judge instructed the members not to consider "that specific liberty condition," for which no evidence had been presented, he had already properly instructed the members to consider all matters in mitigation, which would include the appellant's unsworn statement.[48]

---

[46] *Id.* We also reject the appellant's argument as it relates to the lack of infractions, as there was no such evidence presented before the members.

[47] Record at 647. The trial defense team read a prepared statement from the appellant's wife, which the appellant expressly incorporated as part of his own unsworn statement. *Id.* at 658.

[48] *Id.* at 715-16. And in answering another members' question, the military judge also stated, "You have all the evidence in front of you with respect to aggravation, extenuation, and mitigation." *Id.* at 744.

In analyzing the military judge's response to the members' question, we find the military judge gave a legally correct answer that was "tailored to the facts and circumstances for the case." *Duncan*, 53 M.J. at 499.

We next analyze the military judge's rejection of the trial defense team's request to instruct the members that the appellant spent 732 days in a Liberty Risk status. Our superior court has held that "[w]hile counsel may request specific instructions, the military judge has substantial discretion in deciding on the instructions to give and whether the requested instruction is appropriate. This discretion must be exercised in light of correct principles of law as applied to the facts and circumstances of the case." *United States v. Miller*, 58 M.J. 266, 270 (C.A.A.F. 2003). Denial of a requested instruction, therefore, is error if:

> (1) the requested instruction is correct; (2) it is not substantially covered in the main charge; and (3) it is on such a vital point in the case that the failure to give it deprived [the] defendant of a defense or seriously impaired its effective presentation.

*Id.* (citations and internal quotation marks omitted). All three prongs of the *Miller* test must be satisfied. We conclude that the trial defense team's proposed instruction fails the second prong of the *Miller* test because the military judge's instruction in response to the members' question substantially covered the issue. The members asked a question that called for one of three responses—whether the appellant was "on "class 'C' liberty restriction, tier 3 liberty, or just restricted to base[.]"[49] The military judge answered the question asked, informing the members the appellant was on liberty risk "C."[50]

The exact conditions of the appellant's liberty risk were not in evidence. In fact, the trial defense team made a tactical decision not to present those conditions, although they initially intended to do so.[51] Even before the members began sentencing deliberations and asked this question, the parties spe-

---

[49] AE XLVIII

[50] In actuality, the appellant was on a modified version of liberty risk "C," which entailed several exceptions from liberty risk "C" as the members might understand, so the military judge's answer inured to the appellant's benefit. *See* Record at 733.

[51] The trial defense team contemplated introducing the liberty risk order, but it would require relaxing the rules of evidence and the trial counsel indicated he would then introduce rebuttal evidence. As a result, the trial defense team did not offer the liberty risk order, a decision the trial defense team later characterized as a deliberate "choice." *Id.* at 656.

cifically discussed whether the sentencing instructions should include a reference to the 108-day confinement credit. The trial defense team agreed to delete the proposed instruction from the draft instructions.[52]

Having no evidence in the record of the specific liberty risk conditions—based on trial defense counsel's tactical decision not to present the liberty risk instruction—the military judge was properly concerned about permitting the members to consider the liberty risk in formulating a sentence. It would not be appropriate or feasible to fully incorporate into the military judge's answer all the various exceptions and conditions that were made to the standard liberty risk "C" conditions during each of the 29 times the commander reinstated the order.[53] We are mindful of the perils inherent in presenting evidence during deliberations, and there was no request from the members for additional evidence in this case. *See United States v. Bess,* 75 M.J. 70 (C.A.A.F. 2015).

The military judge appropriately instructed the members not to speculate about the conditions of the appellant's liberty risk—and accordingly not to base their sentence on the conditions they believed *might* have been imposed. And it was appropriate to deny the defense request to graft additional information—substantive evidence the defense chose not to present—into the military judge's answer. The answer to the members' question did not urge them to disregard any other evidence already before them, such as the appellant's unsworn statement. As a result, the military judge did not abuse his discretion in denying the appellant's requested instruction.

### III. CONCLUSION

The findings and sentence are **AFFIRMED**.

Judge TANG concurs.

---

[52] *Id.* at 663, 672. The military judge was concerned the members might sentence the appellant more harshly in order to counteract the sentence credit, and the trial defense team indicated they did not intend to argue the specific conditions on liberty as mitigating factors, although she did reference the appellant's unsworn statement relating to "probation"-like conditions for two years. *Id.* at 663, 709.

[53] *See id.* at 733.

LAWRENCE, Judge (concurring):

I join the lead opinion's reasoning and conclusions, agreeing that the findings and sentence should be affirmed. I write separately, however, to note that the cavalier approach to liberty risk apparent in this case jeopardizes both courts-martial and the legitimate exercise of this vital liberty risk program.

From the time of his apprehension, the appellant clearly constituted a risk to the foreign relations of the United States with direct impact to the neighboring Japanese society. Our superior court notes the dilemma commanders would face were they forced to "choose between jeopardizing international relations by releasing a subordinate properly subject to the liberty-risk program or running afoul of R.C.M. 707." *United States v. Bradford*, 25 M.J. 181, 186 (C.M.A. 1987). The government correctly points out that the conditions of the appellant's liberty risk order were less onerous than those imposed in a number of other cases.[1] And the discussion in R.C.M. 304(a) notes that "[c]onditions on liberty must not hinder pretrial preparation . . . . Thus, when such conditions are imposed, they must [be] sufficiently flexible to permit pretrial preparation." The appellant's liberty conditions did not apparently impede his pretrial preparation. *See United States v. Oliver*, No. 200101259, 2005 CCA LEXIS 129 (N-M. Ct. Crim. App. 29 Apr. 2005) (unpub. op.) (declining to grant relief where there was no allegation that the liberty risk conditions imposed were so onerous to be tantamount to confinement or insufficiently flexible to inhibit pretrial preparations).

There is surely a point at which deference to the commander (and our substantial deference we give to the military judge's finding of fact) becomes untenable. While court-martial would be the most logical conclusion given the seriousness of the allegations and relatively few complexities in taking this case to trial based upon an NCIS-led proactive operation that involved government—civilian and military—personnel as witnesses and took place either online or in areas controlled by the United States, the appellant was on liberty risk "C" for 482 days before his arraignment. It seems clear that Manual of the Judge Advocate (JAGMAN) § 0104b would not contemplate the appellant remaining *indefinitely* onboard this overseas installation subject to these conditions on his liberty while in a non-combat assignment.

This case turns on its procedural posture, in which we owe substantial deference to the military judge's finding that the commander had no "ill in-

---

[1] Government's Brief of 1 June 2018 at 9.

tent" in imposing the conditions of liberty risk.[2] Ultimately, I side with my colleagues and agree that the military judge's finding is not clearly erroneous; however, I believe this is, unnecessarily, a relatively close call. The commander's primary purpose is difficult to discern given the haphazard application of this liberty risk order. The conditions imposed on the appellant do not appear to address the risks he posed to foreign relations—his alleged offenses had nothing to do with alcohol, the command did not impose any conditions on the appellant's ability to mail, email, text message, engage in social media or in telephonic communications or otherwise converse with Japanese nationals, and the decision to keep the appellant in Japan exposed the Japanese to the appellant for considerably longer than if the command had simply returned the appellant to the United States. Nonetheless, the liberty risk conditions imposed were relatively benign, and there is no evidence to suggest that the appellant offered objection or sought to curtail any conditions at the liberty risk review hearings that were held,[3] nor was there any evidence he was either denied a leave request to return to visit his family in the United States or for them, or any other individual, to visit him while he remained on the installation.

Although the command's implementation of liberty risk conditions and occasional inattentiveness to requirements was far from the model, it was clear that the appellant posed the risk contemplated by this program, the conditions imposed were not tantamount to confinement, and the conditions did not limit his ability to prepare for trial. I concur with the lead opinion and its conclusions.



FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[2] Record at 629.

[3] In contrast, this court set aside the finding and sentence and dismissed all charges on speedy trial grounds where " . . . none of the administrative requirements of the liberty risk program, such as notification of the right of appeal, the length of the status, and the right to periodic review, were followed . . . ." *United States v. Wilkes*, 27 M.J. 571, 573 n.1 (N.M.C.M.R. 1988).